## Case No. 7,056.

### The INVINCIBLE.

[3 Sawy. 176.] [1]

District Court, D. California. Oct. 14, 1874.

McAllisters & Bergin, for libellant.

E. Casserly and W. H. L. Barnes, for claimants.

HOFFMAN, District Judge. In the spring of 1864 the libellants shipped on board the Invincible, then lying at the port of New York, and bound on a voyage to San Francisco, 750 baskets of champagne in two lots, one of 500 baskets and the other of 250. By the terms of the bills of lading given for the first lot, the wine was to be stowed in the house on deck. The second lot was to be stowed in the cabin staterooms and house on deck. Under these contracts 659 baskets were placed in the house on deck and the remainder in the cabin staterooms.

On the arrival of the ship the wine stowed in the staterooms was found to be in perfect order. But that stowed in the house was damaged to the extraordinary and almost unprecedented extent of 57 per cent. of its entire value. At the hearing the carrier, after proofs of this loss had been given, attempted to excuse himself by showing that the house on deck was an unfit place for the stowage of goods, and that goods so placed were exposed to extraordinary perils to which cargo below decks was not liable. Although it appeared that the voyage was somewhat rough and boisterous, the claimants failed to show that the injury to the goods was attributable to the direct operation of any peril of the sea, in the strict sense of the term, but they established beyond doubt that the loss of the wine was caused by what is known as "blowage and breakage"—that is, escape of the contents of the bottles, either through their mouths or by their bursting.

He thus proved prima facie, that the injury was occasioned by natural causes, arising from the inherent quantities and perishability of the goods themselves and the nature of the voyage. To this the libellants replied that the damage was excessive and unprecedented, and that it could not be ascribed to the intrinsic infirmity of an article which is every year brought to this port in enormous quantities without serious loss. Some other cause for the injury must therefore be sought for, and this was to be found in the total neglect of the master during the

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

entire voyage to give to the wine proper and necessary ventilation by opening, as occasion permitted, the doors and windows of the house. That through this omission the temperature of the house became so high as to cause the wine to "blow" and the bottles to burst.

It is not pretended on the part of the carrier that any effort whatever was made to ventilate the goods during the voyage by opening the windows or doors of the house. The master seems to have considered it his right and his duty to leave the goods and the house which contained them, in the same condition during the voyage as when they left New York, and this, though apprised by the leakage of wine through the scupper holes of the house for a considerable period, that the goods from some cause were sustaining great injury.

The answer sets up that the excessive heat arose upon the decomposition or fermentation of the straw in which the bottles were packed, caused by its being wetted with salt or fresh water. But the evidence fails to sustain this allegation. No noticeable accident happened to the deck-house during the voyage. The chemical experts failed to detect in the straw when examined here, any trace of the presence of salt, or to discover any signs of chemical changes which could have generated excessive heat.

But even if the heat was due to this cause, it was as much the duty of the carrier to endeavor to mitigate its effects by opening the doors and windows of the house, as to resort to the same expedients to diminish heat caused by the sun's rays. Whether his omission to do so was negligence for which he is liable, is the real point of the case.

The answer also alleges that the champagne in question was a spurious article of inferior quality, and the loss arose from its inherent perishability caused by "defective manufacture, preparation, bottling, corking and packing."

In support of these allegations no proof whatever is offered, save that a few of the baskets were somewhat rat-eaten. The wine was the "Charles Heidseck Champagne," so well known and extensively used in this country, and does not appear to have differed in the mode in which it was manufactured, prepared, bottled and corked, from the wine which the libellants, whose commercial house is of the highest respectability, have for years been in the habit of importing. The fact that all the wine stowed in the cabin arrived in perfect order, would seem to afford decisive proof that there could have been no such defective preparation and packing as the answer alleges.

The whole evidence points, I think, unmistakably, to the conclusion that the blowing and breaking of the bottles was caused by the excessive heat to which they were subjected by being stowed, during the whole of a voyage in which the equator was twice crossed, in a deck-house, tightly closed and exposed on its roof and sides to the direct and reflected rays of the sun.

The question is thus presented, was the omission on the part of the master to cool and ventilate the deck-house by opening its doors and windows when the weather permitted, negligence for which the vessel is liable?

The libellants contend that he was bound to do so by express stipulation, and by his general duty as a carrier—especially when apprised by the leakage of the vessel that the wine was sustaining serious injury. The claimants excuse their omission on the grounds: 1st. That by express agreement the goods stowed in the deck-house were to be at the sole risk of the shipper, and the ship was in no case to be liable for any injury that might befall them. 2d. That the doors and windows were closed and fastened with the full knowledge of Mr. Crosby, the shipper, and with the understanding that they were so to remain during the voyage. 3d. That it was impracticable to open the doors and windows without exposing the goods to injury from salt or fresh water or from the depredations of the crew, and that it was not the duty of the carrier, nor had he the right to meddle in any way with cargo stowed under the supervision and by direction of the shipper.

1. In regard to the alleged agreement, Mr. Hastings, part owner of the ship, testifies that he consented with much reluctance and at Mr. Crosby's earnest request, to the stowage of the wines in the deck-house, and that it was the express understanding that the ship should assume no responsibility and incur no liability "of any name or nature." That the carpenter and stevedore were to fit up the house and stow the goods as Mr. Crosby should direct, and that thereafter the goods were to be at the sole risk of the shipper. In these statements Mr. Hastings is corroborated by Deane, the ship-keeper. Mr. Crosby denies that any such agreement was entered into.

The disputed matter of fact I do not deem it necessary to determine. If the agreement was as broad and absolute as is alleged, parol testimony to prove it was inadmissible, for it is inconsistent with and contradictory to the written stipulations of the bill of lading. Nor if reduced to writing would its legal effect be to exonerate the carrier from the consequences of his actual negligence. The policy of the law will not permit a common carrier to stipulate for exemption from responsibility for the negligence of himself and his servants. Railroad Co. v. Lockwood, 17 Wall. [84 U. S.] 357. Whether there was in this case actual negligence is the very question at issue.

2. The alleged understanding with Mr. Crosby that the doors and windows of the deck-house should be tightly closed and so remain during the voyage, was, if made, un-

questionably binding on him. . An agreement between the parties as to the degree and kind of attention and care to be bestowed on the merchandise during the voyage, in no degree contradicts or varies the obligations of the bill of lading. It merely establishes by mutual consent what shall be accounted, under the circumstances of the case, due care and diligence.

The proofs of this agreement rest on the depositions of Mr. Hastings and Mr. Deane. The testimony of these witnesses, with regard to the release of the ship from all re-sponsibility for the goods, "of every name and nature," has already been noticed.

Mr. Hastings testifies in addition: "Mr. Crosby never said one word to me about ventilation of any name or nature. Never raised the question and never mentioned the word ventilation. I know that the windows and holes in the top of the house were stopped up by Mr. Deane at Mr. Crosby's request. The doors were locked and fastened with screws. Mr. Deane, the carpenter, fastened them. Mr. Crosby was there at the time and saw they were fastened, and expressed himself perfectly satisfied with the stowage and everything appertaining to his wine. Mr. Crosby was present at the fastening. I told him the captain said that without their being fastened the locks would be no protection against the crew. I further said I did not think it would be seaworthy and might vitiate his insurance, as all policies require the hatches to be fastened securely down and made impervious to wet."

Mr. Hastings further states that the only reason assigned by Mr. Crosby for not wishing to stow his wine between decks, was the danger of injury by moisture or sweat.

Mr. Deane corroborates, in a very positive manner, Mr. Hastings's statements.

He testifies to Mr. Hastings's reluctance to allow the goods to be stowed in the deck-house, and to his positive and repeated declarations to Mr. Crosby "that he would take no risk whatever—neither from sailors, heat of galley nor heat of the sun upon the top of the house."

He also testifies that the windows were boarded over by Mr. Crosby's direction; that when the goods were all stowed Mr. Crosby told him to fasten the doors with screws or nails, and that he would take all the risk if he (the witness) would fasten up the doors and windows as directed. The credibility of this witness is somewhat impaired by his evident anxiety to shield the vessel from liability. He iterates and reiterates, on almost every page of his deposition, that Mr. Crosby expressly assumed the whole risk of the adventure, and released the ship from all liability, being apparently under the impression that such an agreement would be decisive of the suit.

Mr. Crosby's testimony is substantially as follows: That about the middle of March, 1863, "he made a verbal agreement with Mr.

Hastings for stowage of the champagne in the deck-house. That it was to be ventilated and protected from heat when at sea, and during the voyage, by keeping the doors and windows of said deck-house open. Mr. Hastings replied that he would do anything I required, to secure ventilation of the champagne. * * * I directed Mr. Hastings to have strips of boards nailed or fastened across the doors a few inches apart on the inside of the deck-house, to secure the wine from falling out when the doors should be opened for ventilation. He replied that it should be done, and called the carpenter and requested me to give directions to him."

In reply to the ninth interrogatory he states, after repeating the verbal agreement with Mr. Hastings, above detailed, that the latter proposed putting in an iron ventilator, but that he told him he considered it of no importance—that the doors and windows would afford a free circulation of air, and was the ventilation he wanted, which Mr. H. agreed to furnish.

He further states: "I had no knowledge whatever of the fastening and boarding of the windows or the fastening and caulking of the doors of the deck-house."

The testimony on this turning-point of the case is thus found to be irreconcilably conflicting. Neither of the witnesses was examined in court. Their testimony was taken by deposition. They are both believed to be merchants of wealth and respectability. The duty of determining which of them is to be believed is delicate and unpleasant. I shall briefly state the considerations upon which my determination is founded:

Several years previous to the shipment by the Invincible, the attention of the libellants, who were largely engaged in the business of importing champagne into this state, had been drawn to the very serious losses sustained by the goods during their transit. After much consideration they came to the conclusion that ventilation, and a free circulation of air, were indispensable to the preservation of the wine. They therefore determined to ship in the cabin and deck house exclusively, and this mode they had pursued for six years previous to the shipment in this case. The results were of the most satisfactory character. The losses which had previously been so great as to create apprehensions that they would be compelled to relinquish the business became almost nominal. Mr. Dibblee states that out of 18,000 baskets imported during five years, and stowed on deck, the percentage of loss by breakage was less than one-half of one per cent., and by blowage less than one per cent.

The clerk of the libellants gives the exact figures taken from their books: Total loss on 18,602 baskets champagne, imported on sixty different vessels (exclusive of the nominable), 245 baskets; 169 by blowage, 76 by breakage. Nor was this practice confined to the libellants alone. It appears in evidence, and is

admitted by the claimants' witnesses, whose testimony was taken in New York, that it is the general practice of shippers of champagne wine to require that it be stowed in the cabin or house on deck, and that such is the usual mode of carrying it.

Under these circumstances, it has appeared to me incredible that Mr. Crosby, while accepting the increased risk of sea damage incidental to stowing the goods in a deck-house should have renounced the only possible benefit or advantage which he could expect from that mode of stowage; should have consented that the easy and efficient means of ventilation afforded by the deck-house should be wholly neglected, and that the goods should remain during an entire voyage, in which the tropics were to be crossed twice, in a room with windows closed, and doors fastened and caulked, and exposed to a temperature which, as one of the witnesses remarked, would be like that of an oven.

The proofs disclose a fact which affords an important corroboration of the conclusion derived from a priori considerations. Mr. Crosby states he requested that slats should be nailed on the inside of the doorways to prevent the wine from falling out when the doors should be opened. This, Mr. Deane informs us, was in fact done by Mr. Hastings's order. He omits to state the reason for doing it. But what reason can be assigned, save that stated by Mr. Crosby? And can the fact that Mr. Hastings gave orders for the purpose, be reconciled with the supposition that he did not expect that the doors would be opened at all during the voyage?

I think these considerations are decisive, and that it may be concluded with tolerable certainty that Mr. Crosby did not expressly or by implication agree to renounce the advantages to be derived from the mode of stowage, on which he insisted, or relieve the carrier from his obligation to exercise reasonable care and diligence for the security and preservation of the goods during the voyage. I also think that Mr. Crosby expressly stipulated for the employment during the voyage, of means of ventilation which the deck-house afforded, whenever those means could reasonably and properly be used.

But if this last proposition be deemed not to have been satisfactorily proven, I will briefly consider whether, in the absence of express stipulation, it was not the carrier's duty, under the circumstances of this case, to secure the safe transportation of the goods by the employment of the means which Mr. Crosby states he expressly promised to adopt.

That under the common bill of lading the carrier is exempted from liability, not only for loss by perils of the sea, but also for damage or deterioration arising from the nature of the articles or the voyage, is not disputed. But if there has been a want of proper care or skill on his part in guarding against such dangers, the damages will be ascribed to negligence and not to the perils of the sea, or the nature of the articles or voyage. Lamb v. Parkman [Case No. 8,-020].

"It is the master's duty, as representing the ship owner, to take reasonable care of the goods intrusted to him, not by merely doing what is necessary to preserve them on board the ship during the ordinary incidents of the voyage; but, also, by taking reasonable measures to check and arrest their loss, or deterioration, by reason of accidents, for the necessary effects which there is by reason of the exception in the bill of lading no original liability." Notara v. Henderson, 4 Marit. Law. Cas. 281. In this case the carrier was held liable for the neglect of the master to take reasonable care (by drying them), of beans which had been wetted by a peril of the sea.

So in the case of The Gentleman [Case No. 5,324], it was held culpable negligence in the master to have omitted to take proper means for the preservation of a cargo of hides by heating, or ventilation, during a detention of the vessel for thirty days at the Cape de Verde Islands by reason of unseaworthiness.

What is the reasonable care which the master must exercise will depend upon the circumstances of the case; and the question under consideration is: Did the failure of the master to take any measures whatever to prevent or arrest damage to the goods, caused by the heat to which they were exposed, constitute a want of reasonable care on the part of the carrier? A large number of witnesses testify that it is neither usual, safe, nor proper to open the windows and doors of a deck-house for the purposes of ventilation, and that to do so would expose its contents to danger from sea-water, from rain, and from the depredations of the crew.

On the part of the libellants many witnesses testify precisely the reverse. I have not ascertained by counting, on which side the witnesses are the more numerous. As to the comparative weight to be given to their testimony, there can be, I think, no room for doubt.

The experience of any one who has sailed in tropical latitudes is sufficient to apprise him that for a large part of the time the doors and windows of a house on deck may be kept open with no appreciable danger of damage to its contents by fresh or salt water. The houses commonly contain rooms used as a galley, a carpenter's shop, a sail-room, and often a forecastle for the crew, and a steerage for passengers. The uses to which these rooms are applied renders it indispensable that the doors and windows should be frequently if not constantly open. They can be readily closed at a moment's notice. The fact that the houses are con-

structed with windows would seem to indicate that the latter are intended to be used and used with safety, and the pretension that it would have been imprudent or improper to open them during any part of a voyage, in which the tropics were twice traversed, appears to me repugnant to common experience and common sense.

The danger from the depredations of the crew, to baskets of wine, by opening in the daytime the doors and windows of a room where the doorways have slats nailed across them on the inside, and the windows are protected by rods, seems to me wholly imaginary.

I think it clear that in this case it was the obvious duty of the master to use the efficacious means at his disposal to prevent or check the damage which the goods might sustain from natural causes, and that to relieve him from that duty he must establish by a preponderance of proofs, that the shipper dispensed with its performance. This, he has, in my view of the evidence, failed to do. The ship is, therefore, liable for his neglect.

I have not found it necessary to pass upon the questions whether certain notes of counsel, offered as substitutes for depositions which have been lost, are admissible in evidence, as my determination of the case would not be affected by their reception or rejection.

At the hearing, the arguments of counsel were directed exclusively to the question of liability of the vessel. The amount of loss was not discussed. I have not been able exactly to ascertain it from the evidence. Although it is probable that the data for its computation are contained in the proofs. It will therefore be referred to the clerk to ascertain and report the amount of damages, unless the parties can fix it by agreement.